## ST. LOUIS & S. F. R. CO. v. LILLY.

No. 5151. Opinion Filed December 7, 1915.

(153 Pac. 810.)

1. **CARRIERS—Passengers—Duty of Carrier.** A railroad company is not bound to give passengers riding on its train special, personal notice of its arrival at their destination, or that a change of cars is necessary at certain points to enable them to continue on the proper route on their journey, but it is the duty of such carrier to furnish those who take passage upon its trains sufficient information to permit them to alight at their journey's end, or to embark upon the trains by which they can reach their destination.

2. **SAME—Calling of Stations.** All that could be required of the carrier of passengers under such circumstances would be to give the usual call in the coach of the arrival at the destination of the passenger, or at such points or stations where a change of cars or trains might be expected.

3. **SAME—Passenger Carried Beyond Destination—Negligence—Exemplary Damages.** Where a railroad company, by reason of the reckless, careless, wanton, and willful neglect of its servants, by not stopping its train, carries a passenger beyond his destination, such passenger, upon recovery of actual damages, may also recover exemplary, or punitive, damages, but in the absence of such reckless, careless, wanton, and willful neglect of duty, such carrier is not liable for exemplary damages.

(Syllabus by Robberts, C.)

*Error from District Court, Carter County;*
*S. H. Russell, Judge.*

Action by Lena Lilly against the St. Louis & San Francisco Railroad Company, a corporation. Judgment for plaintiff, and defendant brings error. Modified and affirmed.

See, also, 31 Okla. 521, 122 Pac. 502, 39 L. R. A. (N. S.) 663.

This case was brought by the defendant in error, herein called plaintiff, against the plaintiff in error, herein called defendant, to recover damages alleged to have been sustained by her as a passenger on defendant's train while en route from Mansfield, Mo., to Ardmore, Okla., by reason of being carried past the city of Sapulpa, a station on defendant's road, where she should have changed cars to continue on the direct route to her destination. Plaintiff alleged that she was hurrying to her home in Ardmore in response to a telegram notifying her of the serious illness of her mother, who was not expected to live; that she purchased from defendant's agent at Mansfield a through ticket to her destination, paying therefor the sum of $8.53; that she was greatly worried and in a nervous state of mind and anxious to arrive at her home at the earliest possible moment, the element of time being of great importance to her under the circumstances; and that "she boarded defendant's train at Mansfield, Mo., on July 27, 1908, and was carried to Springfield, Mo., where, under the guidance of defendant's servants, she alighted from said train and took passage upon another of defendant's trains; that she was unacquainted with the route over which she was to travel, and that she was relying wholly upon the employees of defendant to direct her how to travel in accordance with her ticket; that while the train upon which she was a passenger was approaching Sapulpa, Okla., she made repeated efforts to ascertain from defendant's servants information regard-

ing the route and as to change of cars, if any, but that said servants disregarded her efforts, and ever failed and re-fused to instruct her as to her proper course; that upon arrival at Sapulpa said servants immediately left the train, without instructing her as to any change to be made, and that she had no further opportunity for inquiry, and, rely-ing upon her said ticket, she stayed aboard said train, be-lieving that it would take her to her destination, while in fact, because of the gross, willful, and wanton negligence of said defendant and its servants in not directing her how to travel, and in not informing her that she would have to change trains, when requested, as aforesaid, unknowingly and without fault on her part she remained aboard a train of defendant's other than the one which would deliver her to her destination, and that she was carried to another des-tination other than the one to which her ticket entitled her to passage, in a manner and under the circumstances here-inafter set forth.

"Plaintiff further states that when the train upon which she was riding had started, and the conductor or train auditor, who was a servant of the defendant in charge of defendant's train, and who was charged with the duty of directing passengers, and who was bound to take notice of the provisions of plaintiff's ticket, negligently, willfully, and wantonly then and there failed and refused to notify plaintiff that she was aboard the wrong train; that she was carried to Oklahoma City without her knowledge or con-sent, which is the terminus of that line of defendant's road, and there discharged at 1 o'clock p. m. of July 28, 1908, where, because of her inability to continue her journey on the lines of defendant, she was compelled to remain until about 1:30 o'clock a. m. on July 29, 1908, and then continue to her destination on the Atchison, Topeka & Santa Fe Railroad, which was the quickest and best route left open to her, which company demanded and collected fare to the

amount of $2, which sum defendant has failed and refused to pay; that because of the negligence of defendant, as aforesaid, she was compelled to remain at Oklahoma City about 12 hours; that she was without sufficient money to meet such emergencies, and was compelled to accept the hospitality of strangers, and was greatly humiliated thereby; that she was greatly worried because of the delay, and the fact that she was kept away from her mother's bedside weighed heavily upon her mind, causing great mental pain and anguish; that she arrived at her destination about 6 o'clock on the morning of July 29, 1908, which was about 14 hours after she would have arrived had it not been for the gross, willful, and wanton negligence of defendant as aforesaid.

"Plaintiff further states that because of the several acts of gross, willful, and wanton negligence of defendant and its servants, she was compelled to pay out, to her damage, the sum of $2 railroad fare, and because of her delay in reaching her mother's bedside, and of the humiliation as aforesaid, caused by the gross, willful, and wanton negligence of defendant and its servants she suffered great mental pain and anguish, and great physical exhaustion, so that she was unprepared to hear the news of her mother's death, and that a physician's services were required upon her arrival.

"For all of which gross, willful, and wanton negligence of defendant in committing the several wrongful acts and omissions above set out, thereby causing the injuries as above stated, plaintiff prays for judgment in the sum of $2 compensatory, and $1,997 punitive damages, together with all costs in this action sustained."

The defendant answered:

(1) By general denial; (2) "further answering and for further defense, defendant specifically denies that it was negligent, and defendant alleges that the injuries, if any were sustained by the plaintiff, were directly and proximately caused by her own negligence and want of care in

this, to wit: That the said plaintiff neglected to inform herself before starting on said journey, or at any time during the course of said journey, as to where she could change cars en route to her destination."

To defendant's answer plaintiff replied by general denial. To sustain these issues, the plaintiff testified, in substance, as follows:

"I am the plaintiff in this case and live at Ardmore. I am bookkeeper at the telephone office. My parents are dead. I lived at Ardmore in August, 1908. During the first part of July, 1908, I was in Missouri. I was up there on a vacation, and spent two or three weeks up there. My mother and father were alive when I left home. While in Missouri I received a telegram, calling me home on account of the illness of my mother. I had previously received a letter telling me that she would have to be operated on. I started home on the first train; bought a ticket from Mansfield to Ardmore over the Frisco. I got on the train at Mansfield, and the conductor came through and looked at my ticket and told me to change cars at Springfield. I got off at Springfield and changed cars there. I got on the train at Springfield about 9 o'clock at night, and got off the same train at Oklahoma City about 1 o'clock p. m. the next day. I did not take a sleeper and was up all night. Between Springfield and Oklahoma City the train stopped at Sapulpa and the other stops. I did not know that I was in the car that went to Oklahoma City. Q. I will ask you to tell the jury what effort you made, if any, before getting to Sapulpa, to ascertain whether or not you had to make any change on your route? A. I asked the conductor as he went through the car if I had to change at Sapulpa, and I asked him as he came back through, and he didn't answer me either time. Q. Did you speak that loud enough for him to hear? Q. How close was he to you when you asked him that? A. He passed right by my seat, going down the aisle. Q. Were you in the chair car? A. I don't know whether I was in the chair car or not, but I know I was sit-

ting right next to the aisle. Q. You say you asked him twice? A. Yes, sir. Q. Well, what did you do then? I will get you to state whether or not they called out when you got to Salpulpa that you would have to change cars? The porter or any one else? A. I never heard them." "Neither the conductor or any one else on the train told me between Springfield and Sapulpa that I would have to change cars at Sapulpa. I remained in the same coach that I entered at Springfield. After leaving Sapulpa the conductor did not take up my ticket; he merely looked at it, and handed it back to me. The conductor from Sapulpa was not the same we had before reaching there. The conductor did not tell me I was on the wrong train and did not offer to carry me back, and I came on to Oklahoma City. I had no friend or acquaintances living in Oklahoma City, and was traveling alone. I stayed at Oklahoma City until about 1 o'clock that night. I was there without friends, and was very anxious to get home. I called over the long distance, and notified my folks that I was at Oklahoma City. I got home about 5 o'clock the next morning, and my mother was dead. I did not know she was dead until I reached Ardmore. My brother and Dr. Hardy met me at the train and told me of mother's death. I was in very bad shape. The doctor met me, and they took me home and had to keep me under the influence of hypodermics all day. I could hardly stand it—it nearly killed me when they announced that mother was dead. The doctor then took charge of me, and I was in pretty bad shape for some time after that. My health was poor for a long time. I suffered from nervousness. I have not recovered from the effect of it yet. My ticket from Oklahoma City to Ardmore cost me $2. I came over the Santa Fe. I was under the direct care of the doctor for several months. I was in good health when I got to the train at Mansfield. My condition was about the same at Sapulpa, but there was a change at the time I got off the train at Oklahoma City, and the doctor gave me some medicine at that place. She was a lady doctor, and I was staying at her home. I got worse before I got to Ardmore.

It was because I knew I had missed my train, and it would throw me late, and was afraid mother would be dead when I got there. I was worried on that account.

"CROSS-EXAMINATION.

"I had lived at Ardmore about seven years. I was in Missouri on a vacation. I had been working for the telephone people about two years prior to that time, and I am still working for them. I left Ardmore about July 1st. I was born in Colorado. At the time I made this trip I was a grown young lady. When I left Ardmore the 1st of July I don't know what road I left over. I did not leave to go to Missouri. I went to Tishomingo. I don't know what road I went over to Tishomingo. I don't know what road I traveled over going to Missouri from Tishomingo. I don't remember making any change except at Springfield. I had lived near Springfield, and had been there before this time. When I moved to Ardmore we moved from Mansfield. I don't remember what road we came over. I was about 15 at that time. I don't know whether we came by Sapulpa or not. I knew that Ardmore was south of Oklahoma City. I suppose I had a different conductor between Mansfield and Springfield from the one between Springfield and Sapulpa. It was a couple of hours after receiving the telegram of mother's illness before I left Mansfield. I did not talk to any one else there about what road I would have to go over to get to Ardmore. I could only buy my ticket over the Frisco. I asked no one where I was visiting if I would have to make any changes between Mansfield and Ardmore. I did not know all the changes I would have to make. I did not know I would have to change at Madill. I did not suppose I would get on the train at Mansfield, and get off at Ardmore, but I supposed they would tell me. I just got on the train and supposed they would come and tell me when to change. They came to me between Mansfield and Springfield and told me I would have to change at Springfield. At that place I asked, and they showed me what train to get on. When I got my ticket at Mansfield I did not ask the agent if I would have to make any changes. I do not

remember if I asked any one at Springfield if I would have to make any change. I do not know whether the train I got on at Springfield was a different one from the one I came in on or not. I got off at Springfield and waited some little time. I think there was a different conductor on the train. He looked at my ticket, punched it, and gave it back to me. I had no conversation with him whatever. I did not go to sleep. I was awake all night. I knew when we reached Monett. I do not know whether we changed conductors there or not. I don't know whether I saw the same conductor that I saw at Springfield on the train any more before we reached Oklahoma City or not. I don't think any one took up my ticket between Springfield and Sapulpa again and looked at it. In am sure of it—I am positive. I don't know whether they changed conductors at Monett or not. I had no conversation with the conductor who punched my ticket at Springfield. My ticket was not examined again until after I passed Sapulpa. Just before we got to Sapulpa I asked the conductor if I should change cars at Sapulpa. I have not seen him here this morning. I do not know that I would recognize him. He was a medium sized man and very gray. The gentleman over there is not the man I asked if I should change cars at Sapulpa. I know it was the conductor I was inquiring of. I asked him as he went through the car, and again in a few minutes when he came back through the car. He was the same man that punched my ticket at Springfield. It was daylight when we got to Sapulpa. I did not get off for breakfast. I think the train stayed there about a half an hour. I did not hear the porter announce the station of Sapulpa. I did not hear him say they would stop there for breakfast. I did not hear him say that all passengers for Mounds, Francis, Ada, Denison, and Sherman would go back in the rear coach, and those for Oklahoma City to remain in the coach in which I was sitting.

"I didn't sleep any during that entire night. I remained in the coach while the others got off for breakfast. After we left Sapulpa a new conductor came around to take up

tickets. It was not the gentleman who was brought in for me to identify. I have never seen this man until I saw him at the telephone office yesterday. This conductor, taking up tickets out of Sapulpa, did not say anything to me—just looked at my ticket and handed it back to me. He did not tell me I should have changed cars at Sapulpa. I did not ask him if I could go on to Oklahoma City and take the Santa Fe. I did not know but what I was on the right train. I asked him just before I got there about it, but I did not ask him when he looked at my ticket. It was after I left Sapulpa I asked him if I could make connections at Oklahoma City, and he wanted to know what with, and he told me I would not. When he took my ticket after passing Sapulpa he made no inquiry at all about why I was on that train. When I left Mansfield I did not know whether I would go through Oklahoma City to reach Ardmore or not. I did not ask any one whether I would go through Oklahoma City or not until after I had passed Sapulpa. The conductor was the only one I talked to on the train about where I should make connection. I got to Ardmore the morning after I arrived at Oklahoma City. Mother died before I left Mansfield."

After testifying in her own behalf the plaintiff rested, and the defendant introduced its evidence, which, in substance, is as follows:

E. L. Faye testified:

"My home is in Springfield, Mo. I have lived there 40 years. I am conductor on the Frisco railroad. I have been in the service of the Frisco as conductor nearly 41 years. I was engaged as such on July 27, 1908. I was on the train from Mansfield to Oklahoma City that day, and found the plaintiff on my train after leaving Sapulpa. I examined her ticket after leaving Monett. At that time I told her she was in the Oklahoma City car, and when we got to Sapulpa to go back to the rear car; that that went to the Red River Division. I did not tell her the particular towns on the Red River Division this car went to,

but told her it went to Sherman, Tex. I do not know that she made any reply. I just punched her ticket and handed it back to her. It was not for me to take up. She had to go through two other conductors' hands. I went aboard the train at Monett on the night of July 27th at about 11:25, and we reached Oklahoma City July 28th. I had no further conversation with the plaintiff after I examined her ticket out of Monett until I found her on my train after leaving Sapulpa. At the time I examined her ticket I told her to go back in the rear car on reaching Sapulpa. The porter was along with me, waking up the passengers. I know the station of Sapulpa was called by the porter before the station was reached. I heard him calling the station and heard him calling the changes for the Red River Division. As nearly as I can remember he said: 'This car is going to Oklahoma City; parties going south [called the stations then]—Beggs, Mounds, Francis, Ada, Madill, Sherman—take the next car back.' Q. Now, Mr. Faye, when you found the young lady on the train after you had passed Sapulpa, what conversation did you have with her, if any? A. I asked her why she didn't go back in the other car. I told her she had been carried by. She said she didn't understand what I said to her. I told her I notified her, leaving Monett, and she said she didn't understand what I said to her. I told her she had missed her connection, and if she had rather pay her fare from Oklahoma City on to Ardmore, I would honor her ticket to Oklahoma City; I would help her out that much. Q. What did she say to that? A. She said she would rather do that than get off and go back to Sapulpa. Q. Did you advise her what connection she would make if she went to Sapulpa? A. I told her she would have to lay over 24 hours. Q. Did you have any further conversation with her after you told her you would honor her ticket to Oklahoma City? A. No, sir. Q. I will ask you whether or not this young lady asked you, just before reaching Sapulpa, if she should make a change there? A. No, sir; she did not." "We were due to leave Monett at 11:15. I would not say positively whether we left there on time or not. I was on that train. I don't

know whether I wakened plaintiff or not. I could not say whether she was asleep or not. I know plaintiff was in that car. I had never seen her before. The porter was along, and we came on into Sapulpa. I told her to go back in the rear car. I did not go to her and offer to carry her baggage back. I did not see the porter go back to her. There were quite a number of people in the car. I knew she was traveling alone. We had a porter to help people with their baggage and other things. I didn't send him to wait on this lady. He was there to wait on all of them. I did not go back to see what passengers got off. I give them instructions, and the crew help the people. I gave her the instructions at Monett. Monett is 156 miles from Sapulpa. We got to Sapulpa about 5:30 in the morning. The sun was up. I told her to walk back in the next car at Sapulpa. The porter was standing by and heard it. I next saw her after leaving Sapulpa, when I went through the train. I told her if she got off and went back she would have to lay over 24 hours. There were but two trains a day to Sherman, the last one leaving Sapulpa at noon. She couldn't have gotten back to Sapulpa until 3 in the afternoon. I did not take up her ticket, and do not know where it is now. I think I was asked about the ticket at the office. I think it was presented for refund or something. I did not make any special report about taking her from Sapulpa to Oklahoma City without a ticket. I knew the young lady was carried by when she left Sapulpa."

The defendant then rested, and plaintiff was recalled and gave, in substance, the following testimony:

"I have heard the witness Faye testify to what he says he told me on leaving Monett. He did not tell me anything of the kind. He did not tell me after leaving Sapulpa that if I went back there I would have to lay over there 24 hours, and that he would take me on to Oklahoma City if I preferred. Neither did any other conductor say anything of that kind to me."

At the conclusion of the testimony the court instructed the jury, and, relying upon the briefs, it appears that the only exception taken to the instructions was by the defendant to paragraph No. 13, which is as follows:

"(13) If you find for the plaintiff, you will fix her recovery at a sum not to exceed the amount claimed in her petition, and you may take into consideration in so doing the amount of money expended by her in addition to the sum she would otherwise have had to expend in reaching Ardmore, as testified to in the evidence, and such damages as you may think is commensurate with the effect upon her mental and physical condition, caused by the negligence of the railway company defendant."

Upon the issues thus presented the jury returned a verdict for plaintiff in the sum of $500, and judgment was entered accordingly. Motion for new trial was overruled, exceptions saved, and defendant brings error.

*W. F. Evans, R. A. Kleinschmidt,* and *J. H. Grant,* for plaintiff in error.

*Wm. H. McNeal* and *Cruce & Potter,* for defendant in error.

Opinion by ROBBERTS, C. (after stating the facts as above). Counsel for defendant in their briefs submit the following reasons why this case should be reversed:

"(1) Because plaintiff failed to show any negligence on the part of defendant; (2) because the contributory negligence of the plaintiff was conclusively established by the evidence; (3) because the plaintiff was permitted to testify as to the effect of the alleged negligence of defendant had upon her health, when there were no allegations in her petition authorizing same; (4) because plaintiff asks in the prayer of her petition for $2 compensatory damages, and for $1,997 punitive damages, and the evidence shows clearly and conclusively that she is not entitled to more than the

$2 prayed for, if that; and a verdict was returned for $500; (5) because of errors of the court in its instructions to the jury, especially as to the measure of damages."

The first contention is that the plaintiff failed to show any negligence on the part of defendant. As stated by Justice Hayes, in the former opinion in this case (31 Okla. 521, 122 Pac. 502, 39 L. R. A. [N. S.] 663) :

"The gist of the negligence alleged" in plaintiff's petition "is that upon inquiries by her of the servants of defendant," who were in charge of the train upon which she was riding, "before reaching Sapulpa, for information that would enable her to know where she would have to make the change, said servants neglected and refused to give her such information."

The allegation charges not only negligence, but willful and intentional misconduct, and, if proven, would clearly show negligent and intentional misconduct on the part of defendant. In support of this allegation, the plaintiff testified that she asked the conductor on two different occasions if she had to change at Sapulpa, and he did not answer her at either time. Of course, that was denied by the conductor, but with that the court is concluded. It was, and is, a question for the jury. The law as laid down by Justice Hayes, *supra,* upon the authority of Hutchinson on Carriers, sec. 1129 (2d Ed.) is:

"It is the duty of a carrier to furnish those who take passage upon its trains sufficient information to enable them to embark upon the trains by which they can reach their destination, and that they may be enabled to pursue their journey without unnecessary danger or delay."

"A verdict or findings of the jury, based upon evidence reasonably tending to support them, will not be disturbed on appeal." (*Binyon et al. v. Lyle,* 28 Okla. 430, 114 Pac. 618 [approved and adopted by many other decisions in this court].)

The second contention of defendant is that plaintiff was guilty of such contributory negligence as would preclude her from recovering, and in support of this they contend that it is a matter of common observation that stops on railroads for meals, and all junction points, are always called, and, further, the fact that plaintiff remained in the car for 30 minutes at Sapulpa, while the passengers and crew were taking breakfast, without inquiring of some of the passengers or the ticket agent, or from some other employee or person, if a change of trains or cars was necessary, is inconsistent with ordinary care and prudence, and, taken in connection with the fact that she had, just prior to reaching Sapulpa, made at least two futile attempts to ascertain if she would have to change at that station, is conclusive evidence of gross negligence on the part of plaintiff, in not following up said inquiries.

All these questions of contributory negligence, we must presume, were, under proper instructions, submitted to the jury and, within the well-known rule, will not be disturbed. It must be conceded that the defendant was not bound to give the plaintiff special personal notice that a change of cars was necessary, and also that all that could be required of the defendant would be to give the usual call in the coach of the arrival at the destination of a passenger, or at such stations where a change of cars or trains might be expected; but this case is not based upon these propositions. As stated before, the gist of the plaintiff's complaint is not for failure to give such general notice or information, but her cause of action herein is founded on the neglect and refusal of the servants of the defendant to notify the plaintiff of the necessary changes, when called on by her for such information, which means more than negligence, and amounts to a positive, intentional violation of duty.

The question as to the real facts in the case is by the law and decisions of this court taken away from the trial court and placed in the hands of the jury, and although this court may differ with the jury in its opinion of the true facts, nevertheless, we are bound by the findings of the jury unless they are clearly and manifestly wrong, which we cannot presume to say.

The third contention of counsel is that the plaintiff was permitted, over the objection of defendant, to testify as to the effect the alleged negligence of defendant had upon her health, which was not included in the allegations of her petition. The allegation of the petition is that "she suffered great mental pain and anguish, and great physical exhaustion." In support of this allegation, among other things, she testified as follows:

"Q. Now, Miss Lena, I will get you to tell the jury what your condition was, your physical condition, at the time you got there? A. Well, I was in very bad shape. Q. What effect did the anouncement of your mother's death have upon you? A. I couldn't hardly stand it; it just nearly killed me is all. Q. Then, after that, you say the doctor took charge of you there? A. Yes, sir. Q. And what was your condition after that, for how long? A. Well, I was in pretty bad shape for some time after that; my health was poor for a long time. Q. What was the matter with your health? A. Nervousness. Q. Have you fully recovered from that? A. No, sir; I have not. Q. How long were you under the treatment of a physician after this, by reason of the shock of being left on this train? A. I was under his direct care for several months. Q. Can you tell the jury what was the cause of that? A. Well, it was because I knew that I had missed my train, and it would throw me so late, and I didn't know—I was afraid that my mother would be dead when I got there, and I was worried on that account."

Defendant insists that this particular testimony is immaterial and prejudicial, because the issues do not include the impairment of health. The effect of this contention is that the court should say as a matter of law that "suffering great mental pain and anguish and great physical exhaustion" does not affect or impair the health. This we cannot do. In her testimony, the plaintiff says the trouble with her health was nervousness. This was all left to the jury without the aid or assistance of competent expert testimony, and this court is not inclined to assume the responsibility of entering into the field of scientific diagnostic investigations of this character. The personal opinion of the writer hereof is that "suffering great mental pain and anguish and physical exhaustion" might, under some circumstances, affect the health of a person; but, as said before, we have left that to the jury.

The fourth insistence is that the plaintiff prays for only $2 compensatory damages, and for $1,997 punitive damages, and the evidence shows that she is not entitled to exceed $2 damages, if anything, while the verdict was returned for $500. If the findings of the jury as to the conduct of the servants of the defendant are correct, there can be no question as to plaintiff's right to recover the $2 expended for extra railroad fare from Oklahoma City to Ardmore, and that we will consider as settled. This brings us to the question of the right to recover punitive damages, and therein the amount of such recovery, if any. The plaintiff prays "for judgment in the sum of $2 compensatory, and $1,997 punitive, damages." In the former decision in this case it was said:

"We think the same principle that governs the right of a passenger to recover exemplary damages in cases where a passenger has been carried beyond his destination by fault

of the carrier in not stopping its train or in failing to give, notice of the train's approach to the station of the passenger's destination, is applicable to this case; and that, while in the absence of recklessness, willfulness, wanton or gross negligence the railway company is not liable to the passenger for exemplary damages, if, on the other hand, there is willful or reckless negligence, recovery of such damages may be had. *V. & M. R. R. Co. v. Scanlan,* 63 Miss. 413; *Birmingham Ry., Light & Power Co. v. Nolan,* 134 Ala. 329 [32 South. 715]; *Chicago, St. L. & New Orleans Ry. Co. v. Scurr,* 59 Miss. 456 [42 Am. Rep. 373]; *Dorrah v. Ill. Cent. R. Co.,* 65 Miss. 14 [3 South. 36, 7 Am. St. Rep. 629]; *Memphis & Cincinnati Packet Co. v. Nagel,* 97 Ky. 9 [29 S. W. 743]; *Harlan v. Wabash Ry. Co.,* 117 Mo. App. 537 [94 S. W. 737]; *Samuels v. Richmond & Danville Ry. Co.,* 35 S. C. 493 [14 S. E. 493] 28 Am. St. Rep. 883; *Louisville & Nashville Ry Co. v. Ballard,* 88 Ky. 159 [10 S. W. 429] 2 L. R. A. 694.

"The action of defendant complained of in the case at bar is not one of simple omission to perform a duty; the negligent act does not consist of misdirecting plaintiff or wrongfully informing her, but of intentional and willful refusal to give her information under circumstances that made it the duty of the carrier and its servants to give it to her. If the allegations of the petition be true—and for the purpose of the demurrer they are assumed to be—approaching the very station where it was necessary for plaintiff to depart from the train to make a change of cars in order to reach her destination over defendant's line of railway on which she had bought a ticket, plaintiff not only once, but repeatedly, made an effort to ascertain from defendant's servants such information regarding her route as would enable her to know where to change cars; but her efforts were disregarded and the necessary instructions refused her. This willful negligence on the part of defendant's employees resulted in her being carried off her route, delayed in her journey, and ultimately landed at a point on defendant's road where she was compelled to take passage over another railway company's line in order to reach the end of her journey."

That is the settled law of this case, and is in line with the great weight of authorities on the subject. We are not unmindful of the direct conflict in the testimony of the plaintiff and the conductor in charge of the train, and we are not justified in adopting our views as to the weight of the evidence on that question. Our duty is to adopt the findings of the jury, which we do, and therefore conclude that the conductor, upon the repeated requests of plaintiff, refused to give her the information as to change of cars at Sapulpa, and because of such refusal she was carried to Oklahoma City instead of her home at Ardmore. Counsel for defendant cite Thompson on Carriers of Passengers, sec. 27, p. 573, where it is said:

" 'Exemplary,' 'punitive,' or 'vindictive' damages, sometimes called 'smart money,' are only awarded in cases where there is an element of fraud, malice, or such a degree of negligence as indicates a reckless indifference to consequences, oppression, insult, rudeness, caprice, willfulness, or other causes of aggravation in the act of omission, causing the injury."

This language is peculiarly applicable here wherein it is said:

"* * * Punitive damages are only awarded in cases where there is an element of fraud, malice, or such a degree of negligence as indicates a reckless indifference to consequences, oppression, insult, rudeness, willfulness, or other causes of aggravation in the act or omission, causing the injury."

We are also of opinion that this case, as settled by the findings of the jury, comes within the language of section 2851, Rev. Laws 1910, which is as follows:

"In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud or malice, actual or presumed, the jury,

in addition to actual damages, may give damages for the sake of example, and by way of punishing the defendant."

Considering the question of the amount of punitive damages fixed by the jury, we take it that for compensatory damages they did not exceed the sum of $2 as prayed for, and therefore the balance of the $500 included in the verdict was for punishment of the defendant. In fixing this amount, we cannot take into consideration the death of the mother, nor in fact any other matter; except that the conductor refused to give plaintiff the information asked for, and to our mind, under all the circumstances, a fine of $300 would be sufficient, and the judgment should be reduced to the amount of $302.

We have carefully considered the objections to instruction No. 13, given by the court; and, under all the circumstances of the case, and the holdings herein, we are of the opinion that no error prejudicial to plaintiff was committed in giving that instruction. We therefore recommend that said case be modified as herein before suggested, and affirmed.

By the Court: · It is so ordered.